# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| QT TRADING, LP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:09-702 |
| | § | |
| M/V SAGA MORUS, her engines, | § | |
| tackle, boilers, etc., DAEWOO | § | |
| LOGISTICS CORP.; ATTIC FOREST | § | |
| AS; PATT, MANFIELD & CO. | § | |
| LTD.; and SAGA FOREST CARRIERS | § | |
| INTERNATIONAL AS, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

In this admiralty and maritime case alleging damage to Plaintiff's cargo,

Defendants Saga Forest Carriers International AS, Attic Forest AS and Patt Manfield

& Co. Ltd. have filed a Motion for Summary Judgment [Doc. # 37] ("Motion").

Plaintiff QT Trading, LP, has filed a response,[1] and Defendants have replied.[2]  The

---

[1]   Plaintiff's Response to Defendant's Motion for Summary Judgment and Plaintiff's Cross-Motion for Partial Summary Judgment on the Liability of Defendants [Doc. # 42] ("Response").  Plaintiff's counsel filed duplicate documents on ECF and, although the actual scanned document has the same caption in all three documents, counsel entered different captions on ECF.  *See* Unopposed Motion for Partial Summary Judgment on the Liability of Defendants [Doc. # 43] (duplicate of Doc. # 42); Response to Motion for Summary Judgment [Doc. # 44] (duplicate of Doc. # 42).

(continued...)

Motion now is ripe for decision.  Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court concludes that Defendants' Motion should be **granted**.

## I.   BACKGROUND

### A.   Parties

The vessel M/V SAGA MORUS is a Hong Kong flagged general cargo ship with 11 cargo holds.  Defendant Attic Forest AS ("Attic Forest") is the vessel's registered owner.  At times relevant to this suit, Attic Forest chartered the vessel to Defendant Saga Forest Carriers International AS ("Saga Forest") under a long-term time charter, and Saga Forest then sub-time chartered the vessel to Daewoo Logistics Corporation ("Daewoo") for two years.  Defendant Patt, Manfield & Co., Ltd. ("Patt Manfield") was the ship's technical manager.  Defendants *in personam* Attic Forest, Saga Forest, and Patt Manfield all have appeared in this action, and have filed the pending Motion.

Plaintiff's Complaint also named M/V SAGA MORUS as an *in rem* Defendant

---

[1]      (...continued)
Plaintiff also has filed an Opposed Motion to Extend Time to Permit Plaintiff to File Cross-Motion for Partial Summary Judgment [Doc. # 40].  Because this motion raises arguments that are either resolved or mooted by the holdings in this Memorandum and Order, the motion will be denied as moot.

[2]      Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment [Doc. # 52] ("Reply").

and Daewoo as an *in personam* Defendant.  Neither has appeared before this Court. Daewoo has declared bankruptcy and, although its local agent was served with process on September 1, 2009,[3] the corporation has never appeared or filed an answer.  The vessel M/V SAGA MORUS has not been served with process because it has not entered this judicial district since Plaintiff's complaint was filed.[4]

### B.   Factual Background

Plaintiff QT Trading alleges that its cargo of steel pipes was damaged during transit on the M/V SAGA MORUS.  The relevant cargo was loaded onto the M/V SAGA MORUS at Dalian, China, for delivery to Houston.  It was shipped under two Bills of Lading.  The first, Bill of Lading DWLGSGMHOU83424 ("Bill of Lading '424"), concerned 329 bundles of steel line pipe and was dated April 5, 2008.[5]  The second, Bill of Lading DWLGSGMHOU83425 ("Bill of Lading '425"), concerned 475 bundles of black steel pipes and was dated April 6, 2008.[6]  The Bills of Lading state that the cargo was "clean on board."  The bills failed to incorporate the

---

[3]    *See* Return of Service of Summons Executed as to Daewoo Logistics Corp. [Doc. # 21].

[4]    *See* Memorandum and Order, entered May 21, 2010 [Doc. # 47] (denying motion to transfer venue to Central District of California).

[5]    Bill of Lading DWLGSGMHOU83424, dated Apr. 5, 2008 (Exhibit A to Motion, at first and second unnumbered pages) ("Bill of Lading '424").

[6]    Bill of Lading DWLGSGMHOU83425, dated Apr. 6, 2008 (Exhibit A to Motion, at third and fourth unnumbered pages) ("Bill of Lading '425")

preloading survey of the cargo and the mate's receipts, which evidenced some preloading damage to Plaintiff's cargo, as detailed below.

The cargo was inspected preloading at Dalian, China by Wu Yuguo of Beacon Marine Consultant, Ltd. on April 2-6, 2008.[7]   Yuguo's report to the Master of M/V SAGA MORUS, dated April 6, 2008, specifically reported the preloading condition of the cargo under Bills of Lading '424 and '425.  He noted, *inter alia*, broken pipes, scratched coating, oil stains, and rust stains:

> S/O No. DWLGSGMHOU83424—NEWLY PRODUCED PRIME QUALITY ERW STEEL PIPES
>
> 1.  Stored in open air without cover;
> 2.  The protective cover for pipes missing/broken/deformed, affect[] 65 bundles;
> 3.  Pipes projecting from bundle 1-2 pieces, affect 34 bundles[;]
> 4.  Locally chafed on pipe wall with coating scratched, affect 120 bundles;
> 5.  Oil stained on surface, affect 35 bundles;
> 6.  Partly rust stained on inner surface of steel pipes, affect 4 bundles.
>
> S/O No. DWLGSGMHOU83425—NEWLY PRODUCED PRIME QUALITY ERW STEEL PIPES

---

[7]   Declaration of Wu Yuguo (Exhibit 1 to Motion) ("Yuguo Declaration"), at 1; Preloading Survey Report—Addendum, Beacon Marine Consultant, Ltd., dated April 11, 2008 (Exhibit F to Motion) ("Preloading Survey").  Although the Addendum is dated April 11, 2008, the document indicates that the preloading survey was conducted on April 2-6, 2008.  The Addendum attaches photographs which are date-stamped April 3-6, 2008.  *See id*. at bates-stamped pages SAGA 000006-000039.  It also attaches a document entitled Preshipment Cargo Condition Report, which is signed by Wu Yuguo and dated April 6, 2008.  *See id*. at bates-stamped pages SAGA 000062-000070; *id*. at 000067 (report on Plaintiff's two Bills of Lading).

1.      Stored in open air without cover;
2.      The protective cover for pipes missing/broken/deformed 1-3 pcs., affect[] 90 bundles;
3.      Locally chafed on pipe wall with coating scratched, affect 12 bundles.[8]

The survey states that Yuguo inspected five cargo holds, including hold # 10, where Defendants state that the relevant cargo was stored.[9]  The inspection revealed that "[t]he hold spaces appeared dry and reasonably clean[,] free of signs of water streaks," and that "[b]ilges were reasonably clean and bilge suction was reportedly effective."[10] The survey also states that the inspectors conducted silver nitrate tests, which apparently test for seawater rust.  The silver nitrate test was performed "randomly" to the cargo loaded at Dalian, some of which was Plaintiff's cargo, "at the port yard and quayside," and "[n]o positive reactions were observed."[11]  Plaintiff relies on these

---

[8]      Preloading Survey, at SAGA 000067.  Yuguo stated in his declaration that the pipes were bundled for shipping and that he inspected and documented the piles that were "readily accessible and visible" but did not "break apart bundles of pipes."  Yuguo Declaration, at 2, ¶ 7.

[9]      Plaintiff does not contest the assertion that its cargo was in Hold # 10.

[10]      Preloading Survey, at SAGA 000002, ¶ B-4.

[11]      *Id*. at SAGA 000003, ¶ C-1.  The report gives no further detail about which cargo was subjected to the random testing.  The Yuguo Declaration, in an apparent reference to the cargo under the Bills of Lading '424 and '425, states "I found rust generating on the surface of pipes where coating was chafed but found no positive reaction when I conducted silver nitrate tests."  Yuguo Declaration, at 2, ¶ 8.  Paragraph 8 does not specifically refer to the cargo under Bills of Lading '424 and '425, but Paragraphs 7,
(continued...)

negative silver nitrate reactions to establish that the cargo had only *de minimus* damage at loading, and that contamination of the cargo occurred during carriage.

The Mate's Receipts for the relevant Bills of Lading incorporate the Preloading Survey.[12]   The Mate's Receipts stated that the goods were "clean on board" but contained additional handwritten notations that the cargo's condition was "as per P&I surveyor report"—in other words, the Preloading Survey conducted by Yuguo "on behalf of the Skuld P & I Club."[13]

However, when the Bills of Lading were issued for the cargo, they did not reflect any defect in the cargo's condition.   Both bills state that the carrier was Daewoo Logistics Corp, that the consignee was QT Trading, and that the goods were "clean on board."[14]   The bills did not reference the Mate's Receipts or the Preloading Survey.  The bills were signed by Daewoo, not by any of the Defendants who have

---

[11]     (...continued)
        9, and 10 all are dedicated to said cargo.

[12]     Shipping Orders dated Apr. 5 & 6, 2008 (Exhibit B to Motion) ("Mate's Receipts") (shipping orders for Bills of Lading '424 and '425).  *See* Declaration of Man Tak Yung (Exhibit 3 to Motion) (custodian of records for Defendant Patt Manfield & Co. states that documents in Exhibit B were kept in regular course of business).

[13]     Preloading Survey, at SAGA 000001.

[14]     Bill of Lading '424; Bill of Lading '425.  The bills also state that the goods were "freight prepaid."

appeared in this action.[15]

The M/V SAGA MORUS arrived at the Port of Houston on May 19, 2008.

Plaintiff hired John Zemanek of Zemanek Marine Services to inspect the cargo upon

its discharge from the vessel.[16]   The survey noted damage to the cargo in Hold # 10.

It stated that scattered pipes had "gouged bevels, flat ends and [were] bent along the

length," and that the conditions were "indicative of rough, careless and/or improper

handling during loading operations as well as faulty stowage aboard the ocean

carrier."[17]   It further noted that the bundles in Hold # 10 had "moderate to heavy

---

[15]   Daewoo, as stated above, filed bankruptcy and has not appeared before this Court. Daewoo, as charterer, was authorized to sign the bills by the Charter Party, a contract between Saga Forest and Daewoo:

> Charterers [Daewoo] and/or their agents are hereby authorized by Owners [Saga Forest] to sign on Master's and/or on Owners' behalf Bills of Lading as presented *in accordance with Mate's or Tally Clerk's receipts* without prejudice to Owners' rights under this Charter Party, *but Charterers to accept all consequences that might result from Charterers and/or their agents signing Bills of Lading not adhering to the remarks in Mate's or Tally Clerk's receipts*.

Time Charter, Government Form, dated Nov. 7, 2007, between Saga Forest (owner) and Daewoo (charterer) (Exhibit D to Motion) ("Charter Party"), at SAGA 000050 (clause 53) (emphasis added).

[16]   Survey Report No. M6-82180 by Zemanek Marine Services, Inc., re: M/V SAGA MORUS, QT Trading, LP, Houston Discharge, dated July 5, 2008 (Exhibit I to Motion) ("Discharge Survey").

[17]   *Id*. at 3.

surface rust."[18]  Zemanek, on behalf of QT Trading, notified the vessel's master that the cargo's condition was "damaged and non-conforming."[19]

Zemanek later conducted an additional survey to ascertain the extent and cause of damage.[20]  His second report stated that 165 bundles of pipe were "rust damaged beyond a sound salable condition."[21]  Zemanek submitted a rust sample to Dixie Services Incorporated for a chemical analysis.  The Dixie Services report, attached to Zemanek's survey, concluded that the cargo had been in contact with a foreign substance other than seawater, and possibly with seawater as well:

> The above analysis indicates the sample to have been in contact with a foreign substance of other than seawater origin.  The high calcium and sulfate concentrations would tend to indicate that this foreign substance was calcium sulfate, although other materials could also be the source. The relatively high sodium and chloride content could be indicative of seawater contact also, but the contribution of the foreign substance to the soluble chemistry precludes a definite determination of whether the sample was also in contact with seawater.[22]

---

[18]    *Id.*

[19]    *Id.* at fifth unnumbered page (memorandum from Zemanek to Master, M/V SAGA MORUS dated May 24, 2008).

[20]    Survey Report No. M6-82225 by Zemanek Marine Services, Inc., re: M/V SAGA MORUS, QT Trading, LP, Damage Survey, dated Oct. 26, 2008 (Exhibit J to Motion) ("Damage Survey").

[21]    *Id.* at 2-3.

[22]    Report No. 129567 from Mical C. Renz, Dixie Services Inc. to Zemanek Marine
(continued...)

Zemanek concluded that the damage to the cargo had occurred during carriage, relying explicitly on the clean bills of lading: "In view of the ocean bill of lading being issued without remarks" and the damage noted upon the cargo's discharge in Houston, "it is the opinion of the undersigned surveyor that the rust contamination had occurred during ocean transit while they were in possession of the ocean carrier."[23]  Zemanek stated the damaged pipe could be reconditioned at a cost of $31,066.63.[24]

Plaintiff filed suit in this Court on March 10, 2009.[25]

## II.   SUMMARY JUDGMENT STANDARD

---

[22]   (...continued)
Services, dated June 13, 2008 (Exhibit J to Motion at fifth unnumbered page) (discussing rust couplings from steel pipe under Bills of Lading '424 and '425).

[23]   *Id*. at 3.

[24]   *Id*. at 4.  Plaintiff also has submitted affidavits from Zemanek and from Andrew Pearl, Logistics Coordinator for QT Trading.  Defendants have moved to strike both affidavits.  *See* Motion to Strike Affidavit of John P. Zemanek [Doc. # 49]; Motion to Strike Affidavit of Andrew Pearl [Doc. # 50].  Plaintiff has responded to the motions.  *See* Doc. # 57.  The Zemanek Affidavit restates the information in Zemanek's report, discussed above, and adds a discussion of the Preloading Survey, which he interprets as evidencing only "minor fresh-water rust" upon loading in Dalian.  Affidavit of John P. Zemanek, Jr. (Exhibit 3 to Response), at 2, ¶¶ 7-8.  The Pearl Affidavit reaches the same conclusions, stating that the cargo showed only "minor fresh-water rust" upon loading and therefore that contamination occurred during carriage.  Affidavit of Andrew Pearl (Exhibit 2 to Response), at 2, ¶¶ 7-8.  Because the Court does not rely for its rulings on any of the statements in the Zemanek and Pearl Affidavits, Defendants' motions to strike are denied as moot.

[25]   Complaint [Doc. # 1].

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.[26]   Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[27]

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact."[28]   The moving party, however, need not negate the elements of the non-movant's case.[29]   The moving party may meet its burden by pointing out "the absence of evidence supporting the nonmoving party's case."[30]

---

[26]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).

[27]   FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

[28]   *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).

[29]   *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).

[30]   *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (internal citations and quotations omitted).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial.[31]  "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[32]

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party.[33]  However, factual controversies are resolved in favor of the non-movant "only 'when both parties have submitted evidence of contradictory facts.'"[34]  The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings.[35]  Likewise, "conclusory allegations" or

---

[31]   *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted).

[32]   *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

[33]   *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

[34]   *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (quoting *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999)).

[35]   *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002), *overruled on other grounds*, *Grand Isle Shipyards, Inc., v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009).

"unsubstantiated assertions" do not meet the non-movant's burden.[36]  Instead, the nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case."[37]  In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts.[38]

Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence.[39]  A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary.[40]

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court. Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence

---

[36]    *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).

[37]    *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted).

[38]    *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

[39]    *See* FED. R. CIV. P. 56(e); *Love v. Nat'l Medical Enters.*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733, 745 (S.D. Tex. 2003).

[40]    *See In re Hinsely*, 201 F.3d 638, 643 (5th Cir. 2000).

to support a party's opposition to summary judgment."[41]

## III.   ANALYSIS

Defendants move for summary justment on three claims: (1) the Carriage of Goods at Sea Act ("COGSA"); (2) negligence; and (3) bailment.

### A.   COGSA

Plaintiff brings a claim pursuant to the Carriage of Goods at Sea Act ("COGSA").[42]  Defendants argue that no Defendant is liable under COGSA because none is a COGSA "carrier."

Recovery under COGSA is available only from the "carrier" of the goods, defined as the owner or charterer of the vessel who enters into a "contract of carriage" with the shipper.[43]  "We have expressly held that to recover under COGSA, the cargo owner must establish that the vessel owner or charterer executed a contract of carriage

---

[41]   *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (internal citations and quotations omitted).

[42]   46 U.S.C. § 30701 note.  In 2006, COGSA was re-codified as a historical and statutory note to 46 U.S.C. § 30701.  It previously was codified at 46 U.S.C. §§ 1300-1315.  *See Rexroth Hydraudyne B.V. v. Ocean World Lines, Inc.*, 547 F.3d 351, 354 n.2 (2d Cir. 2008).

[43]   *Steel Coils, Inc. v. M/V LAKE MARION*, 331 F.3d 422, 436 (5th Cir. 2003); *Sabah Shipyard Sdn. Bhd. v. M/V HARBEL TAPPER*, 178 F.3d 400, 405 (5th Cir. 1999); *Thyssen Steel Co. v. M/V KAVO YERAKAS*, 50 F.3d 1349, 1351 (5th Cir. 1995) (citing *Pacific Employers Ins. Co. v. M/V GLORIA*, 767 F.2d 229, 234 (5th Cir. 1985); *Assoc. Metals & Minerals Corp. v. SS Portoria*, 484 F.2d 460, 462 (5th Cir. 1973)).

with the cargo owner."[44]

In this case, the "contracts of carriage" are Bills of Lading '424 and '425. Plaintiff therefore must establish that one or more of the Defendants was a party to the Bills of Lading.[45]   As stated above, the bills were signed by Daewoo,[46] who was named as a Defendant in this action but has not appeared before this Court.   The bills of lading list Plaintiff as the consignee, but do not name any of the three Defendants. The bills of lading, on their face, therefore do not establish any Defendant as a COGSA carrier.

However, a charterer such as Daewoo may be authorized by contract to sign a bill of lading on behalf of the Master or owner of the vessel.   The courts recognize that a charterer's signature on the bill of lading can be binding on the vessel's owner, if the owner has authorized the charterer to sign on its behalf:

> A contract of carriage with the vessel owner may be either directly between the parties, or by virtue of the charterer's authority to bind the vessel owner by signing the bill of lading "for the master."  However, if the charterer signs the bill of lading without the authority of the vessel owner, then the owner does not become a party to the contract of carriage and does not become liable as a "carrier" within the meaning of

---

[44]   *Thyssen*, 50 F.3d at 1351.

[45]   *Id.* at 1352 ("The cargo owner has the burden to prove that the vessel owner was a party to the contract, and its failure to do so establishes that the cargo owner did not rely on the vessel owner to perform the contract.")

[46]   Bill of Lading '424 (signature box states "AS AGENT FOR THE CARRIER: DAEWOO LOGISTICS CORP."); Bill of Lading '425 (same).

COGSA.[47]

In this case, Clause 53 of the Charter Party between Daewoo and Saga Forest expressly limited Daewoo's authority to sign the Bills of Lading, granting authorization "in accordance with Mate's or Tally Clerk's Receipts" and providing that Daewoo would "accept all consequences that might result" from signing bills that did not conform to the Mate's Receipts.[48]

As stated above, Daewoo signed Bills of Lading '424 and '425 with the notation "clean on board."   The bills referred neither to the Mate's Receipts, which stated "cargo condition as per P&I survey report," nor to the Preloading Survey, which noted damage to the cargo.[49]   Because Daewoo did not sign in accordance with

---

[47]   *Thyssen*, 50 F.3d at 1352 (internal citations omitted).

[48]   Charter Party, at SAGA 000050 (clause 53) ("Charterers [Daewoo] and/or their agents are hereby authorized by Owners [Saga Forest] to sign on Master's and/or on Owners' behalf Bills of Lading as presented ***in accordance with Mate's or Tally Clerk's receipts*** without prejudice to Owners' rights under this Charter Party, ***but Charterers to accept all consequences that might result from Charterers and/or their agents signing Bills of Lading not adhering to the remarks in Mate's or Tally Clerk's receipts***") (emphasis added).

[49]   Plaintiff argues that the Mate's Receipts could not possibly incorporate Yuguo's Preloading Survey, because the Survey was issued on April 11, 2008. *See* Response, at 5- 6.  The Mate's Receipt for Bill of Lading '424 was signed on April 5, 2008, and the Mate's Receipt for Bill of Lading '425 was signed on April 6, 2008.  However, on close inspection, the documents are not inconsistent.   The Preloading Survey clearly reflects that the survey inspections were  conducted over a four day period, April 2-6, 2008, and the original formal survey is dated April 6, 2008.  Preloading Survey, at SAGA 000062.  Although the survey  contains an addendum, which was signed on April 11, 2008 (*id*. at SAGA 00001-00004), the recitation of the damage
(continued...)

the Mate's Receipts, its signature on the bills exceeded the authority granted to it by

Saga Forest in the Charter Party.[50]  Saga Forest therefore was not a party to the Bills

---

[49]    (...continued)

to cargo under Bills of Lading '424 and '425 is included in the Preloading Survey dated April 6, 2008.  *Id*. at SAGA 000062-000070; *id*. at 000067 (report on Plaintiff's two Bills of Lading).  Moreover, the addendum signed on April 11 states in its heading, "Date of Survey: 02nd-06th April 2008."  *Id*. at SAGA 000001.

Plaintiff also disputes that the documents presented by Defendants as "Mate's Receipts" are actually Mate's Receipts, because they bear the title "Shipping Orders." *See* Exhibit B.  The text of the documents entitled "Shipping Orders" reads, "Receive on board the undermentioned goods apparent in good order and condition and sign the accompanying receipt for the same."  *Id*.  As noted above, the documents state "cargo condition as per P&I surveyor report."  *Id*.  They bear signatures on the lines stating "Tallied By _____" and "Approved by _____."  *Id*.  In other words, they fulfill all of the functions of the Mate's Receipt, or Tally Clerk's Receipt, referenced in the Charter Party.  Plaintiff's assertion, based only on the documents' titles, is unpersuasive.  In any event, Daewoo was authorized by the Charter Party to sign bills of lading ***only*** "in accordance with the Mate's or Tally Clerk's Receipts," and failed to do so.  *See* Bill of Lading '424 ("clean on board" with no exceptions noted and no reference to Mate's or Tally Clerk's Receipt); Bill of Lading '425 (same).  Plaintiff has presented no other documents purported to be Mate's Receipts that evidence cargo received in clean condition, such as would be necessary to justify Daewoo's signature on the clean bills of lading.

[50]    *See Thyssen*, 50 F.3d at 1352; *Cargill Ferrous Int'l v. M/V SUKARAWAN NAREE*, 1997 WL 537992, *4 (E.D. La. 1997) (Schwartz, J.) (agent issued clean bills of lading despite damage noted on mate's receipts and therefore exceeded authority granted by the ship's owner, which explicitly limited authorization to bills of lading issued in accordance with mate's receipts; owner therefore was not a party to the contract of carriage and not liable as a COGSA carrier); *Tuscaloosa Steel Corp. v. M/V NAIMO*, 1992 WL 477117, *3 (S.D.N.Y. 1992) (Cannella, J.) (charterer's agent who signed bills of lading, but omitted the rust damage on the cargo as indicated in the mate's receipts, acted outside the scope of its authority because the owner granted authority only to sign according to mate's receipts; therefore, the bills of lading are not binding on the shipowners).

of Lading, and cannot be held liable as a COGSA carrier.[51]  Similarly, to the extent Plaintiff argues that Defendants Patt Manfield or Attic Forest are liable as COGSA carriers, Plaintiff's argument fails.  Plaintiff has made no showing that either Patt Manfield or Attic Forest was a party to the Bills of Lading or otherwise authorized Daewoo's signature on the bills.

Additionally, to the extent Plaintiff relies on two other authorizations that exist in the record,[52] such reliance is unavailing.  Assuming that the authorizations are applicable to the dispute at bar,[53] both expressly limit the authorization to bills of lading signed in accordance with the Mate's Receipts.[54]  Again, Daewoo exceeded this authority when it signed "clean" bills of lading that failed to incorporate the Mate's Receipts.

---

[51]  *Cargill*, 1997 WL 537992, *4;  *Tuscaloosa*, 1992 WL 477117, *3.

[52]  Authorization for Signing Bills of Lading, dated Apr. 6, 2008 (Exhibit C to Motion); Re: Authorization to Sign Bills of Lading, dated Apr. 7, 2008 (Exhibit G to Motion).

[53]  The authorization in Exhibit G appears not to apply because, although it is directed to the Master of M/V SAGA MORUS, it is dated April 7, 2008, after the vessel had sailed from Dalian with Plaintiff's cargo, and lists the port as Inchon, Korea.  The authorization in Exhibit C bears the correct date of April 6, 2008, but is directed to "Dalian Ocean Favor Int'l Shipping Agency Co., Ltd." rather than to Daewoo.  The parties appear to agree that this addressee was Daewoo's agent, although neither cites to evidence establishing this agency relationship.

[54]  *See* Exhibit C ("You are hereby authorized to sign on my behalf all the bills of lading . . . according with [sic] the Mate's Receipt and the P&I remarks"); Exhibit G ("This signature may only be given after ensuring that the original Bills of Lading are issued in strict conformity with the Mate's Receipts").

Because no Defendant authorized issuance of Bills of Lading '424 and '425, which failed to reflect the damage noted by the Mate's Receipts and the Preloading Survey, no Defendant is a party to the Bills of Lading.  Therefore, no Defendant can be held liable as a "carrier" under COGSA.[55]  Summary judgment is granted in favor of Defendants.

###     B.     Maritime Negligence

Plaintiff does not clearly plead a claim for maritime negligence.  Defendants nevertheless moved for summary judgment on the claim, in the event such claim was deemed pleaded.   In its Response, Plaintiff opposes summary judgment as to negligence.

The elements of a negligence claim under general maritime law are: (1) a duty owed by defendant to plaintiff, (2) a breach of that duty, (3) injury sustained by

---

[55]     Plaintiff's briefing makes extensive argument regarding the merits of its COGSA claim.  *See* Response, at 17-21.  In support of its COGSA claim, Plaintiff submits evidence from Mical C. Renz of Dixie Services, Inc., and John P. Zemanek of Zemanek Marine Services, Inc., which Plaintiff argues establishes that the relevant cargo was contaminated during carriage on M/V SAGA MORUS.  Defendants have moved to exclude the Renz and Zemanek testimony, arguing that the testimony does not meet the reliability and relevance standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 597, 592-93 (1993).  *See* Defendants' Motion to Exclude Testimony of Plaintiff's Expert Mical C. Renz [Doc. # 38]; Defendants' Motion to Exclude Testimony of Plaintiff's Expert John P. Zemanek [Doc. # 39].

The Court does not address the merits of Plaintiff's COGSA claim because, as held above, the claim fails on the threshold issue of Defendants' liability under COGSA as "carriers."   Therefore, the Court does not rely on the testimony of Renz and Zemanek to which Defendants object, and Defendants' motions are denied as moot.

plaintiff, and (4) a causal connection between defendant's conduct and plaintiff's injury.[56]

Plaintiff's Response does not clearly identify Defendant(s) against which it brings a negligence claim.  Plaintiff also fails to articulate the duty owed by any Defendant, how the duty was breached, and how a Defendant's conduct caused the cargo damage in issue.  Rather, Plaintiff apparently argues that Defendants are liable for negligence merely because Plaintiff's cargo was contaminated during carriage.  In support of this argument Plaintiff asserts that the Preloading Survey conducted at Dalian shows *de minimus* preloading rust damage to four bundles of cargo, whereas the Zemanek report shows rust contamination to 165 bundles of cargo upon arrival in Houston.[57]

Plaintiff's evidentiary burden on a negligence claim is to show that a Defendant's conduct was, more likely than not, the cause of Plaintiff's damages.[58] However, Plaintiff's experts cannot, by their own admission, conclusively identify the specific cause of the contamination.  The Dixie Services report, attached to Zemanek's survey, concluded only that the cargo had been contaminated by "a foreign substance

---

[56]    *Canal Barge Co. v. Torco Oil Co.,* 220 F.3d 370, 376 (5th Cir. 2000) (citing *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991)).

[57]    Response, at 16-17 (discussing Dixie Services' report regarding the source of contamination).

[58]    *Marquette Transp. Co. v. La. Machinery Co.*, 367 F.3d 398, 402 (5th Cir. 2004).

of other than seawater origin" and that, although the test results "could be indicative of seawater contact also," no definite determination was possible.[59]   Plaintiff apparently argues that Defendants can be held liable collectively for the contamination simply because it occurred during carriage, and relies on the fact that the Preloading Survey yielded negative silver nitrate results whereas the survey upon discharge yielded positive silver nitrate results.[60]   Plaintiff asserts that "[w]hether [the contamination resulted] from seawater or another contaminant containing chlorides is irrelevant."[61]

This argument is insufficient to raise a genuine issue of material fact for a maritime negligence claim against any of the three named Defendants.[62]   The Fifth

---

[59]   Report No. 129567 from Mical C. Renz, Dixie Services Inc. to Zemanek Marine Services, dated June 13, 2008 (Exhibit J to Motion at fifth unnumbered page) ("The above analysis indicates the sample to have been in contact with a foreign substance of other than seawater origin.  The high calcium and sulfate concentrations would tend to indicate that this foreign substance was calcium sulfate, although other materials could also be the source.  The relatively high sodium and chloride content could be indicative of seawater contact also, but the contribution of the foreign substance to the soluble chemistry precludes a definite determination of whether the sample was also in contact with seawater.").

[60]   Response, at 16-17.

[61]   Id. at 16 n.1.

[62]   Moreover, the Court questions whether the Preloading Survey in fact establishes *de minimus* preloading damage, as Plaintiff asserts.  The Preloading Survey reflects only "random" silver nitrate testing.  Preloading Survey, at SAGA 00003.  Yuguo stated in his declaration that he did not break apart any bundles of pipe, and therefore only inspected the exterior pipes that were visible, which may have been a small number

(continued...)

Circuit has held that a plaintiff's presentation of various speculative theories of causation, with no showing that any one theory is more likely true than not, is insufficient to defeat a defendant's motion for summary judgment.[63]  Plaintiff's expert report, which states that the cause of the cargo's contamination cannot be conclusively determined, is insufficient to defeat summary judgment.  Plaintiff has failed to demonstrate any genuine issue of material fact that any particular Defendant caused the claimed damage to the cargo.

Summary judgment is granted for Defendants on any maritime negligence claim Plaintiff intends to assert.

### C.    Bailment

As with negligence, Plaintiff has not clearly pleaded a claim for bailment, but has joined issue on the claim in its Response.  Bailment is "the delivery of goods or personal property to the bailee in trust, under an express or implied contract, which requires the bailee to perform the trust and either to redeliver the goods or to otherwise

---

[62]    (...continued)
compared to the total in the shipment.  Yuguo Declaration, at 2, ¶ 7.

[63]    *Meza v. MSC Ship Management HK Ltd.*, 345 F. App'x 19, 21 (5th Cir. 2009) (plaintiff's evidence that a twist lock *possibly* fell because it was defective is insufficient to defeat summary judgment; plaintiff must show that the twist lock *more likely than not* fell because it was defective); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1078-79 (5th Cir. 1994) (because plaintiffs' theory in a wrongful death case was "only one of many speculative reasons" explaining the events relevant to the case, the district court correctly granted summary judgment in favor of defendants).

dispose of the goods in conformity with the purpose of the trust."[64]   Bailment requires a showing that delivery to the bailee is complete and that the bailee has "exclusive possession" of the bailed property, even as against the property owner.[65]

Plaintiff fails to demonstrate a genuine issue of material fact that any Defendant is liable under bailment.  As an initial matter, Plaintiff has failed even to specify which Defendant is allegedly liable under bailment.  Plaintiff also has presented no evidence of a written or oral contract of bailment between Plaintiff and any Defendant. Moreover, Plaintiff has failed to present evidence that any Defendant was a "bailee" with "exclusive possession" of the cargo.   In its briefing, Plaintiff cites to an "Interclub Agreement," which it characterizes as placing on the vessel owner exclusive responsibility for damages for contamination or seawater damage.[66] Plaintiff then asserts that "'[e]xclusive responsibility' under the Interclub Agreement is imputed to owners as 'exclusive bailment responsibility' . . . ."[67]  Plaintiff cites no legal authority or provision of the Interclub Agreement in support of its position that that Agreement can establish "exclusive possession" under bailment law.  The Court is entirely unpersuaded.

---

[64]     *Thyssen*, 50 F.3d at 1354-55.

[65]     *Id*.

[66]     *See* Response, at 22-23 (citing Exhibit 4 to Response).

[67]     *Id*. at 23.

Because Plaintiff has not demonstrated a genuine issue of material fact, summary judgment is granted for Defendants on any bailment claim Plaintiff asserts.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment [Doc. # 37] is **GRANTED** on all Plaintiff's theories.  It is further

**ORDERED** that Defendants' Motion to Exclude Testimony of Plaintiff's Expert Mical C. Renz [Doc. # 38] is **DENIED AS MOOT**.  It is further

**ORDERED** that Defendants' Motion to Exclude Testimony of Plaintiff's Expert John P. Zemanek [Doc. # 39] is **DENIED AS MOOT**.  It is further

**ORDERED** that Plaintiff's Opposed Motion to Extend Time to Permit Plaintiff to File Cross-Motion for Partial Summary Judgment [Doc. # 40] is **DENIED AS MOOT**.  It is further

**ORDERED** that Defendants' Motion to Strike Affidavit of John P. Zemanek [Doc. # 49] is **DENIED AS MOOT**.  It is further

**ORDERED** that Defendants' Motion to Strike Affidavit of Andrew Pearl [Doc. # 50] is **DENIED AS MOOT**.

SIGNED at Houston, Texas, this **15<u>th</u>** day of **June, 2010**.

Nancy F. Atlas
United States District Judge